**KROMER et al. v. KOEPGE et al.**
**Civ. A. No. 6713.**

United States District Court
N. D. Ohio, W. D.
Dec. 19, 1952.

572

Schwer & Moore, Murray & Murray, Sandusky, Ohio, for plaintiffs.

Ritter, Boesel & Lord, Toledo, Ohio, Flynn, Py & Kruse, Sandusky, Ohio, for defendants.

KLOEB, District Judge.

The petition in this case for declaratory judgment was filed in the Court of Common Pleas of Erie County, Ohio, and was duly removed to this Court by defendant Anna D. Koepge, hereinafter referred to as defendant, on the ground of diversity of citizenship, plaintiffs being citizens of the State of Ohio and defendant being a citizen of Washington in the District of Columbia.

The petition and the exhibits attached thereto recite in great detail and in chronological order the events that led to the presentation of this matter to the Court. Because of the great amount of detail involved and necessary to a correct understanding of the events that led to the dispute between the parties hereto,

the Court will not review the recitations of the petition or, in general, those of the exhibits, but a reading of these documents is necessary to obtain a full and correct background of the reasons for the dispute between the parties.

Exhibit B referred to as the escrow agreement, and particularly paragraph 3 thereof, is quite important. Paragraph 3 reads as follows:

"3. That in the event any one of the five persons mentioned in this agreement, John L. Rieger, Mary Rieger, Anna Rieger, Walter Rieger or Pierre L. Rieger, shall at any time desire to sell his or her stock in The Hotel Rieger Company, or any part of the same, he or she shall give unto the other four stockholders of the company actual notice in writing, delivered in person to each and every one of the other four stockholders, of his or her desire to sell his or her said stock, or a part thereof, stating in said written notice the number of shares which he or she desires to sell; and each and every one of the other said four stockholders shall have the right and privilege, for the six months next following the date of the receipt by him or her of the written notice aforesaid described, to purchase for cash payable on the date of purchase, the one-fourth part of the stock mentioned in said written notice, at a price which shall be determined and fixed by having made as of the day of purchase an appraisal of the assets, and property and business of The Hotel Rieger Company, and a determination of the net worth of the company, by a competent and well qualified appraisal company selected and employed by The Hotel Rieger Company, and the valuation of said stock as determined by said appraisal and by said finding as to net worth of the Company shall be the price which shall be paid for said stock; and in the event any one of said other four stockholders declines to

purchase, or does not purchase within said six months period his or her one-fourth part of said stock so offered for sale, the remaining stockholders shall be duly notified in writing in person of that fact on the day next following the expiration of said six months period, or as soon thereafter as is possible, and each shall have the next following ten days from the date of the receipt of said notice by him or her in which to purchase his or her equal proportion of said stock upon the terms hereinbefore mentioned; but if any stockholder declines to purchase or does not purchase within said period of ten days the stock to which he is so entitled, the remaining stockholder or stockholders shall be notified in writing in person of that fact and shall have the right to purchase immediately said stock not so taken by said stockholder, upon the terms hereinbefore mentioned, and in equal proportions if there are two or more purchasing stockholders. All written notices required to be given by the provisions of this paragraph shall be given by the person desiring to sell his or her stock. None of the capital stock of The Hotel Rieger Company now owned or hereafter acquired by the five incorporators and present stockholders of said company shall be sold in any manner otherwise than in strict accord and full compliance with the terms and requirements of this paragraph, except upon the mutual consent and approval in writing of all of the parties entitled to purchase the stock which is to be sold."

On July 17, 1948, Walter H. Rieger and Pierre L. Rieger, his brother, and defendant, a sister-in-law, were the only surviving parties to Exhibit B. On that date, Walter and Pierre Rieger directed a notice of desire to sell shares in the Hotel Rieger Company to defendant (Plaintiffs' Exhibit D), as required by the provisions of paragraph 3 of the escrow agreement. At that time, Walter was the owner of 400¾ shares and Pierre was the owner of 176¾ shares. Defendant was the owner of 172½ shares. These shares comprised the total outstanding shares of the Hotel Rieger Company, to wit, 750 shares.

On July 20, 1948, defendant acknowledged receipt of the notice dated July 17, in the following language (Plaintiffs' Exhibit E):

"I acknowledge receipt of your notice dated July 17th, 1948, wherein Dr. Walter H. Rieger and Pierre L. Rieger offer to me their combined holdings in Hotel Rieger, Sandusky, Ohio, totalling 577½ shares, in the manner and under the terms and conditions set forth under the provisions of the agreements of January 18th, 1922 and April 17, 1922."

Under date of September 15, 1948, defendant directed Plaintiff's Exhibit F to Walter and Pierre Rieger, which exhibit reads as follows:

"I, Anna Koepge, hereby acknowledge receipt of your offer to sell to me the shares of stock in the Hotel Rieger Company, an Ohio corporation, which stand in your name. This offer you have extended to me in accordance with the provisions of a certain instrument in writing bearing date of the 17th day of April, 1922. I hereby exercise my rights in accordance with the provisions of said instrument in writing to purchase said shares. I direct that arrangements be made in accordance with the provisions to be found therein, particularly Paragraph 3, that an appraisal shall be made of the assets, property and business of the Hotel Rieger Company, and a determination made of the net worth of the Company by a competent and well qualified appraisal company. I shall be glad to discuss with you the retention of a well qualified appraisal company, to the end that the selection may be one mutually acceptable to all of us.

"I shall wait your advice."

On November 8, 1948, Walter H. Rieger, president of the Hotel Rieger Company, and acting for and in behalf of the Board of Directors thereof, directed a letter (Plaintiffs' Exhibit G) to the Ostendorf-Morris Company, Guardian Building, Cleveland, Ohio, in which he authorized the company "to proceed in strict and meticulous conformity with the exact letter of the above provisions, in order that there may be no grounds for objection on either side based upon pure technicalities."

The Ostendorf-Morris Company thereupon proceeded to make an appraisal of the property and assets of the Hotel Rieger Company and, as the result thereof, made their report (Plaintiffs' Exhibit L) which they summarized as follows (p. 37):

"It is your appraisers' conclusion after giving careful consideration to the foregoing findings, that the final value of The Real Property, Inventory and Business, as of December 1, 1948, is: Six Hundred Thousand Dollars ($600,000)."

On January 15, 1949, defendant directed a letter (Plaintiffs' Exhibit H) to Walter and Pierre Rieger, in which she stated, among other things, the following:

"It is my considered opinion that the sum of $600,000 arrived at by the Ostendorf-Morris Company is so excessive as to indicate capriciousness, bias and incompetence. You and Ostendorf-Morris Company were acquainted with the fact that the hotel was listed for sale for some six months and that no one indicated a genuine interest in purchasing the property at even half that figure. There are other reasons why the appraisal appears to be arbitrary, unreasonable and demonstrates either unfairness or incompetence or both. I therefore demand that a fair appraisal be made in conformity with the Agreements. Until a fair appraisal is made in accordance with the Agreements, it is my position that they have not fulfilled and are controlling."

Under date of January 29, 1949, Walter and Pierre Rieger addressed a communication (Plaintiffs' Exhibit I) to defendant, in which they recited, among other things, the following:

"You are, of course, very familiar with the fact that the 1922 Agreement provides that the appraisal to be used shall be made 'by a competent appraisal company selected and employed by The Board of Directors of The Hotel Rieger Company.' Passing over all preliminaries, the fact remains that Ostendorf-Morris Company, a competent appraisal company, was duly employed to make this appraisal by the affirmative votes of four of the five directors of the corporation.

"Under the 1922 Agreement, the valuation so determined is final as to all parties. We think you must realize that, if the appraisal figure had turned out to be far below what we considered the fair value of our holdings, we would none the less have had to go through with the sale to you, if you had been ready and able to perform."

It appears that, about this time, the defendant, of her own volition and at her own expense, employed the American Appraisal Company to make an appraisal of the Hotel Rieger Company, and that this company made such an appraisal and a report to the defendant, which concludes as follows (Defendant's Exhibit 1, p. 15):

"The value of the enterprise with proper relationship of these various considerations is believed to be reflected in the amount of $300,000.00 as of the date of this investigation, November 30, 1948."

There is also in evidence Plaintiffs' Exhibit N, which is a letter written by defendant to Wilbert G. Schwer, who is now one of the plaintiff executors, which letter was written on February 28, 1948, at a time when all the parties were at-

tempting to sell the Hotel as an entity. In this letter defendant makes the following statement:

"We are also in accord on the tentative sales price somewhere between $700,000.00 and $600,000.00."

Pierre L. Rieger died testate on the 30th day of January, 1951, and Walter H. Rieger died testate on the 27th day of June, 1951. By virtue of the will of Pierre L. Rieger, his 176¾ shares became the property of his brother, Walter H. Rieger, and the executors of the last will and testament of Walter H. Rieger are the plaintiffs herein.

In defendant's answer to the petition, paragraph 2 reads as follows:

"For answer to paragraph 9 this defendant admits that Ostendorf-Morris Company of Cleveland, Ohio, was selected to make an appraisement of the assets, property and business of The Hotel Rieger Company by the affirmative votes of all the members of the Board except this defendant, Anna D. Koepge, but specifically denies that said selection was made pursuant to the provisions of Exhibits 'A' and 'B'; further answering this defendant avers that, in making the selection of the said Ostendorf-Morris Company as such appraiser, the Board of Directors of The Hotel Rieger Company was dominated by and subservient to the decision of Walter H. Rieger, who was then the president of The Hotel Rieger Company and owned the controlling stock therein; that said Board consisted of five members: the shareholders, Walter H. Rieger, Pierre L. Rieger and Anna D. Koepge, as listed in paragraph 5 of the petition, and Carl V. Kromer, who was the manager of the hotel, and Wilbert G. Schwer, who was the personal attorney of Walter H. Rieger; that the decision of the members of said Board in selecting Ostendorf-Morris Company as an appraiser was determined by said Walter H. Rieger and that the members of said Board voting thereon did not exercise their independent judgment in making such selection, but voted as dictated by Walter H. Rieger."

Paragraph 4 of the answer reads as follows:

"For answer to paragraph 11 this defendant admits that Ostendorf-Morris Company did make a purported appraisal of the assets, property and business of The Hotel Rieger Company and delivered two copies thereof to Walter H. Rieger and one copy to this defendant, Anna D. Koepge; this defendant further avers that said purported appraisal was not made by a competent and qualified appraisal company as provided for in Exhibits 'A' and 'B' and that said appraisement was not made with the consent of Anna D. Koepge; that the directors did not consult with this defendant in the employment of said Ostendorf-Morris Company as to making such appraisal, although the defendant requested of Walter H. Rieger and Pierre L. Rieger that they discuss with her, prior to the time said appraisal was made, the retention of a well qualified appraisal company to the end that the selection might be one suitably acceptable to all; that the said purported appraisement so made was deliberately planned and devised by Walter H. Rieger and Pierre L. Rieger so as to obtain a larger appraised value of the assets, property and business of said corporation, than the reasonable value thereof, as provided for in Exhibit 'B', and thus enable them to obtain a larger and more substantial sum from this defendant in the sale of their stock to this defendant; that said purported appraisement was in excess of the reasonable value and that reasons for the refusal of this defendant to consider or accept such appraisement are set forth in Exhibit 'H'."

It thus appears from the answer, as well as from Plaintiffs' Exhibit H, that

defendant takes and took the position that the appraised value arrived at by the Ostendorf-Morris Company, to wit, $600,000, is excessive, and that the selection of the appraisal company was made by a Board of Directors of the Hotel Rieger Company that was dominated by and subservient to Walter H. Rieger; that the Ostendorf-Morris Company was not a competent and qualified appraisal company as required by paragraph 3 of the escrow agreement, and that she, the defendant, was not consulted concerning the employment of the Ostendorf-Morris Company, and that their employment was undertaken without her consent; that the appraisement was planned and devised by Walter Rieger and was, therefore, in effect a rigged appraisement to which she should not be bound.

At the trial of the case on October 2, 1952, plaintiffs presented Edwin H. Smith, of Cleveland Heights, Ohio, who is the manager of the appraisal department of the Ostendorf-Morris Company, and who had charge of the appraisement of the Hotel Rieger Company. Mr. Smith testified that the Ostendorf-Morris Company has been in existence at Cleveland, Ohio, for fourteen years; that they conducted the appraisal of the Allerton Hotel in Cleveland and of two other hotels; that he never knew Dr. Walter Rieger who ordered the appraisal, and that he spoke to Dr. Rieger but once during the conduct of the appraisal and then only to pass the time of day; that he never talked to or corresponded with Dr. Rieger about the appraisal, and that Dr. Rieger never attempted to exert any influence in connection with the appraisal and over him.

Plaintiffs offered Edmund T. Collins, who is in the general real estate business in Toledo, Ohio, and who belongs to the American Appraisal Institute. He testified that the Ostendorf-Morris Company also belongs to the American Appraisal Institute and that the company is a competent and well qualified company of good reputation.

Claude Campbell, in the Real Estate and Appraisal business in Toledo, Ohio, was offered by plaintiffs, and testified that he knows the Ostendorf-Morris Company and Edwin H. Smith, and that both the company and Mr. Smith have an excellent reputation, ability, experience and integrity, and that the company is very highly regarded. He further testified that he had examined the appraisal report and he pronounced it as having been prepared according to accepted methods.

Defendant offered the report of the American Appraisal Company, but presented no witnesses in support of said report or for the purpose of explaining the basis for the report or the accuracy thereof. Defendant offered no witnesses in support of her contentions enumerated in paragraphs two and four of the answer. The record is barren of proof thereon. Apparently she takes the position that the difference between the appraisal figures arrived at by the Ostendorf-Morris Company and the American Appraisal Company raises an inference that the figures of the Ostendorf-Morris Company are "so excessive as to indicate capriciousness, bias and incompetence". The Court cannot agree with this reasoning. So far as the record is concerned, the appraisal figures arrived at by the American Appraisal Company may reflect the same weaknesses. There is no authority or requirement in the agreement to submit counter-appraisals. The agreement authorized the Hotel Rieger Company to select a competent and well qualified appraisal company and in the opinion of the Court the proofs clearly indicate that this the Hotel Company did. In so doing it was not necessary for the Hotel Company to discuss the proposed selection with the defendant or obtain her consent, as an individual, to the selection.

Defendant now contends, among other things, that the offer to sell made by Walter and Pierre Rieger was not made by "one of the five persons" mentioned in paragraph 3 of the escrow agreement and as provided therein, but was made jointly by Walter and Pierre who were then the owners of all the stock other

than that owned by defendant, and defendant further contends that the appraisal did not find the "net worth" of the Hotel Rieger Company as required by paragraph 3. These contentions appear to be superficial and more in the nature of an afterthought. They were not reasons assigned by defendant in her refusal to carry through with her agreement to purchase as recited in Exhibit H.

The Court is thus presented with the ultimate question as to whether or not Walter and Pierre Rieger fully and effectively discharged their obligations to the defendant under the escrow agreement.

There appears to be no question but that the escrow agreement as drawn on April 17, 1922 was reasonable and proper, made upon a good and sufficient consideration and, therefore, mutually binding upon the parties thereto. In the opinion of the Court, there appears too to be no question but that plaintiffs' decedent Walter Rieger and his brother Pierre fully discharged their obligations under the escrow agreement and that further restraint on the alienation of their stock interests in this corporation would be obnoxious to public policy, especially in view of the fact that all of the original parties to the agreement, except defendant Anna D. Koepge, are deceased.

At the conclusion of the complaint filed herein, plaintiffs submitted to the Court seven questions which they felt should be resolved before they would be able to proceed with the orderly administration and settlement of their trust. These questions are as follows:

"First Question

"Are the plaintiffs, as the personal representatives of said Walter H. Rieger, deceased, still bound by the Escrow Agreement (Exhibit "B"), notwithstanding the fact that all of the original parties to said agreement, save and except the defendant, Anna D. Koepge, are now deceased?

"Second Question

"If the plaintiffs, who possess in their fiduciary capacities, more than the voting power required by statute to cause and authorize the defendant, The Hotel Rieger Company, as a corporation, to sell all of its assets and business to a third party, should cause such sale to be made, thereby resulting in the liquidation and dissolution of said corporation, would the proceeds inuring to the 577½ shares of their decedent be then fully and freely available to them as money, for the purposes of the settlement of their decedent's estate?

"Third Question

"The Escrow Agreement (Exhibit 'B' 'B') makes provision only for the sale or transfer from one of the subscribers to another one or more of the subscribers. Accordingly, should the answer to the First Question be in the affirmative, and should they offer the shares owned by their decedent to the defendant, Anna D. Koepge, and should she, for any reason whatsoever, fail or refuse to purchase said shares, would they then be free to offer said shares for sale to third parties? And would such third parties become bound by the Escrow Agreement?

"Fourth Question

"The Escrow Agreement (Exhibit 'B') provides in its terms that it shall be and remain in full force and effect so long as Anna Rieger (now Anna D. Koepge) is a stockholder of The Hotel Rieger Company. What would be the effect of her death upon said Escrow Agreement, should it occur while the status of things is substantially as at present?

"Fifth Question

"This question is presently hypothetical, but it is indisputable that the estate of said Walter H. Rieger must be settled, and that the Ohio Inheritance Tax and Federal Estate

Tax must be paid, somehow. If, in casting about for a solution of this problem, the persons beneficially interested in and entitled to the proceeds from the sale of said shares should elect, instead, to take the shares themselves, and to contribute pro rata and proportionately the moneys needed for estate purposes, would they be entitled to have such shares distributed to them in kind?

"Sixth Question

"If the answers to both the First Question and to the Fifth Question should be in the affirmative, would the new shareholders thereby created be bound, by implied or constructive substitution, by the Escrow Agreement (Exhibit 'B')?

"Seventh Question

"Is the Escrow Agreement (Exhibit 'B'), considered by itself, void because it is an unreasonable restraint upon the fundamental right to own and enjoy one's own property?"

The Court is of the opinion that the first question should be, and is, answered in the negative; the second question is answered in the affirmative; the third question remains unanswered because question one is answered in the negative; the fourth question is not answered because, at this writing, the defendant Anna D. Koepge has not passed away and the Court, holding that the escrow agreement is now void, does not deem it advisable to delve into probabilities contingent upon a possible appeal; the fifth question is answered in the affirmative; the sixth question is predicated on an affirmative answer to the first and fifth questions, and the Court has answered the first question in the negative, however, the new shareholders, if any, created by virtue of an operation under question five, would not be bound, by implied or constructive substitution, by the escrow agreement (Exhibit B); question seven is answered in the affirmative, because of the changed conditions and circumstances since the year 1922.

The Court finds an interesting article in the work of Professor Edwin Borchard, "Declaratory Judgments, Second Edition", at page 523, entitled "Release from the Obligation of Contract", and particularly the subparagraph entitled "Change of Conditions", found on page 524, which reads as follows:

"As an alternative to a suit for a declaration that the contract has been terminated, for defendant's breach or other reason, the plaintiff may ask a declaration that he is released from further obligations under it, because of some change of conditions, such as new legislation or governmental interference, or because of act of the defendant giving the plaintiff the privilege of withdrawal or legally lifting the obligation, as, for example, where one of several joint guarantors is released by the principal debtor or the creditors, or by waiver of the defendant; or that the plaintiff is released because of the defendant's fraud or misrepresentation, or because of the defendant's failure to perform or other improper act, or of the plaintiff's own act discharging his obligation. * * *"

(Cited thereunder, we find: Lynch v. Melby, 1933, 129 Cal.App. 646, 19 P.2d 49).

Professor Borchard was Professor of Law at Yale University and Co-Draftsman of the Uniform Declaratory Judgments Act and of Federal and State Acts and Rules.

Rule 57 of the Federal Rules of Civil Procedure, 28 U.S.C., reads in part as follows:

"Declaratory Judgments. The procedure for obtaining a declaratory judgment pursuant to Title 28, U.S.C., § 2201, shall be in accordance with these rules, * * *."

Rule 52 provides in part as follows:

"Findings by the Court

"(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court

shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment; * * *."

In accordance with the rule, plaintiff may prepare findings of fact and conclusions of law drawn in accordance with this opinion and file the same within ten days; defendant may, within five days after plaintiffs have filed their findings and conclusions, file her exceptions or suggested additions thereto.